Todd Logan – SBN 305912
tlogan@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Patrick DeBlase – SBN 167138
deblase@dbelegal.com
DeBlase Brown Eyerly LLP
Los Angeles, California 90021
Tel: 310.575.9955
Fax: 310.575.9919

Justin Shrader*
justin@shraderlaw.com
D'Arcy L.R. Rapp*
darcy@shraderlaw.com
Jim Hartle*
jim@shraderlaw.com
Nick Fernelius*
Nick@shraderlaw.com
SHRADER & ASSOCIATES
9 Greenway Plaza, Suite 2300
Houston, Texas 77046
Tel: 713-782.0000
Fax: 713.571.9605

*Attorneys for Plaintiffs*

*To seek admission *pro hac vice*, through
designated local counsel Patrick DeBlase

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **JEANNIE GRIGGS AND JASMINE PATTERSON, INDIVIDUALLY AND AS HEIRS OF MARK** | ) ) ) ) | **Case No.:** 2:23-cv-06926 <br><br> **COMPLAINT** |

1

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

| | |
|---|---|
| **GUSTAFSON, DECEASED, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,** | ) ) ) ) ) **JURY TRIAL DEMANDED** |
| *Plaintiffs* | ) ) |
| **v.** | ) ) ) |
| **PAC-12 CONFERENCE AND NATIONAL COLLEGIATE ATHLETIC ASSOCIATION** | ) ) ) ) |
| *Defendants* | ) ) |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Jeannie Griggs and Jasmine Patterson ("Plaintiffs") bring this Class Action Complaint and Demand for Jury Trial against Defendants the Pac-12 Conference ("Pac-12") and the National Collegiate Athletic Association ("NCAA") (collectively "Defendants"). This Class Action Complaint seeks redress for all persons injured by the Defendants' reckless disregard for the health and safety of University of California, Los Angeles ("UCLA") student-athletes. Plaintiffs allege the following based upon personal knowledge as to Mark Gustafson, and, as to all other matters, upon information and belief, which includes investigation conducted by their attorneys.

## INTRODUCTION

1.    Every year, more than 400,000 college athletes compete across three divisions at over 1,000 colleges and universities that are member schools within the NCAA.

2.    Of these athletes, a large percentage play college football, attracting vast audiences live at stadiums across the country and in front of television sets.

This massive interest in college football generates significant revenue for the Defendants through stadium gate receipts and television contracts.

3.    Despite the massive national attention on the sport of college football, and the correspondingly massive revenue it generated them, Defendants Pac-12 and the NCAA failed to address an issue that was slowly killing the human beings responsible for the meteoric rise in the sport's popularity.

4.    The issue, to put it simply, is the number of violent head impacts that are suffered by college football players every single year. These head impacts frequently result in concussions and can, over time, increase the risk for a number of deleterious neurological and brain conditions, including Parkinson's disease, dementia, loss of memory, loss of executive skills, paranoia, Chronic Traumatic Encephalopathy ("CTE"), and other related symptoms and conditions.

5.    These violent head impacts often recur frequently throughout the season, both at practices and during games, which only amplifies the long-term health risks identified above.

6.    The Defendants knew of the long-term consequences of sub-concussive impacts, concussions, and concussion related injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from college football, but opted to actively conceal what they knew to preserve the revenue generated by the game.

7.    While in college, UCLA football players were under Defendants' care. Unfortunately, due to the Defendants' inaction and indifference to their long-term health, UCLA players would suffer negative, indelible health impacts during the rest of their lives.

8.    Despite possessing a wealth of scientific literature and research that articulated the dangers of TBIs, Defendants failed to enact policies and procedures to protect Mark Gustafson and other UCLA football players. In fact, some of this

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

ample scientific information came from researchers and clinicians from member institutions of the NCAA and Pac-12.

9.      As a direct and proximate result of the Defendants' actions (or failures to act), Plaintiffs, as heirs of Mark Gustafson, bring this complaint on behalf of Mark Gustafson and a Class of former players (defined below) who suffered and/or continue to suffer from neurological and cognitive injuries, including symptoms resulting from Chronic Traumatic Encephalopathy ("CTE").

## PARTIES

10.     Plaintiff Jeannie Griggs is Mark Gustafson's long-term partner, executor of his will, and one of two named heirs. Plaintiff Jeannie Griggs is a natural person and citizen of the state of Oregon.

11.     Plaintiff Jasmine Patterson is Mark Gustafson's only child and one of two named heirs. Plaintiff Jasmine Patterson is a natural person and citizen of the state of Washington.

12.     Plaintiffs Griggs and Patterson bring this lawsuit on behalf of Mark Gustafson ("Gustafson"), a football player who played for UCLA in the 1960s and died in 2021 from, among other causes, CTE.

13.     Defendant Pac-12 Conference is an unincorporated association with its principal place of business located at 360 3rd Street, 3rd Floor, San Francisco, California 94107. Defendant Pac-12 is not organized under the laws of any State, but is registered as a tax-exempt organization with the Internal Revenue Service. As such, Defendant Pac-12 is a citizen of the State of California pursuant to 28 U.S.C. § 1332(d)(10). Defendant Pac-12 conducts business throughout the District, the State of California, and the United States.

14.     Defendant NCAA is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is not organized under the laws of any State, but is

registered as a tax-exempt organization with the Internal Revenue Service. As such, Defendant NCAA is a citizen of the State of California pursuant to 28 U.S.C. § 1332(d)(10). Defendant NCAA conducts business throughout this District, the State of California, and United States.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the Class, which consists of at least 100 members, is a citizen of a state different from Defendants and (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs.

16.    This Court has personal jurisdiction over Defendants because they conduct significant business in this District, including entering into consumer and business contracts here and because the unlawful conduct alleged in the Complaint occurred in and/or was directed at this District.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### I.    The NCAA and Pac-12 Had a Duty to Protect Their Student-Athletes.

18.    The NCAA oversees college athletics, including those who compete for Pac-12 schools. In total, as indicated on its website, the NCAA is responsible for the oversight of 500,000 students who participate in intercollegiate athletics in twenty-four different sports.[1]

---

[1]    Overview, *National Collegiate Athletic Association*, ncaa.org/sports/2021/2/16/overview.aspx (last visited Aug. 7, 2023).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

19.    Due to the wide-range of student-athletes at its member institutions, the NCAA in 1973 created its current three division structure, which allows athletes more opportunities to compete for championships.[2]

20.    Each NCAA division has several conferences, which (theoretically) promotes regional competition. Since 1928, UCLA has competed in the Pac-12 Conference.[3]

21.    UCLA's football program has a strong following and a devoted fan base, which allows it to make millions of dollars for the school annually. Due to this and the team's on-field success, UCLA is able to recruit athletes from across the country to compete on the UCLA football team.

22.    The Defendants collectively govern, regulate, and oversee the UCLA football program, which carries with it a duty that they promote and safeguard the well-being of these college athletes.

23.    The NCAA, since its founding in 1906, has stated the safety of student athletes is of paramount importance. On its website, the NCAA touts the "safety guidelines and playing rules" it creates to minimize the health and safety risks college athletes face when competing.[4]

24.    The NCAA (then called the Intercollegiate Athletic Association of the United States ("IAAUS")), was specifically created to address the alarming number of head injuries that were plaguing college football. To preserve the continued viability of the sport, President Theodore Roosevelt met with Ivy League university

---

[2]    *See* Footnote 1.
[3]    *See* History of the Pac-12 Conference, *Pac-12*, pac-12.com/about-pac-12#pac12history (last visited Aug. 7, 2023).  UCLA, however, has recently announced that it intends to leave the Pac-12 Conference and join the Big Ten Conference. UCLA is slated to start competing in the Big Ten in 2024. *See* "The Big Ten Land Oregon and Washington, Leaving the Pac-12 Bereft," *The New York Times*, nytimes.com/2023/08/04/sports/ncaafootball/pac-12-oregon-washington-big-ten-big-12.html (last visited Aug. 7, 2023).
[4]    Well-Being, *National Collegiate Athletic Association*, ncaa.org/sports/2021/2/10/health-and-safety.aspx (last visited Aug. 7, 2023)

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

presidents to discuss how to make football safer. The NCAA (then the IAAUS) was created as an outgrowth of these meetings, and thus it is fair to say the NCAA's *raison d'etre* was player safety.

25.    In the Convention Proceedings for the IAAUS [5] in 1906, the Association stated its purpose, acting through the Football Rules Committee, to bring about a "vast improvement in the game of football, both in regard to the risks to life and limb which were felt to have been too great, and especially in the better moral tone of the play."

26.    College athletics at NCAA member institutions, at all times relevant to the facts in this complaint, were, and continue to be, tightly regulated by the NCAA Constitution, Operating Bylaws, Administrative Bylaws, and sports rules, that govern in great detail all matters relating to athletic events, including player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility criteria, and scholarships.

27.    The NCAA articulates in its Constitution the Association's purported commitment to the safety of the college athletes that it oversees:

> The basic purpose of the Association is *to support and promote healthy and safe intercollegiate athletics*, including national championships, as an integral part of the education program and the student athlete as an integral part of the student body.

NCAA Const., Preamble (emphasis added).

28.    The NCAA Constitution requires that members "ensure compliance with the rules established by the Association, its division and conference. It is the responsibility of each member institution to report all rules violations to its respective NCAA division and conference in a timely manner and to cooperate

---

[5]    The IAAUS changed its name to the National Collegiate Athletic Association ("NCAA").

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

fully with enforcement efforts." NCAA Const., Art. 1, Section E ("Institutional Control").

29.    Starting in 1933, and now issued annually, the NCAA publishes a Sports Medicine Handbook (the "Handbook"), which includes official NCAA policies for the treatment and prevention of sports injuries, as well as return-to-play guidelines for those who sustain injuries while competing.

30.    The NCAA Constitution empowers member conferences to conduct championships in one or more sports, but dictates that these member conferences comply "completely and promptly with the rules and regulations governing the division enforcement process and shall cooperate fully with that process as a condition of membership in the Association." NCAA Const., Art. 2, Section C.

31.    In addition to compliance with the division enforcement process, the NCAA Constitution emphasizes that all conferences "must adhere to the principles and provisions in this Constitution." NCAA Const. Art. 2, Section C.

32.    In other words, per the NCAA's own constitution, the NCAA holds itself out as an authority on both preventing and treating injuries, an authority that college athletes, the Pac-12, UCLA, and all other member institutions can rely on for guidance on matters of player health and safety.

33.    The Pac-12, as a member conference in the NCAA, was required to implement and enforce health and safety guidelines to protect the health and safety of the athletes under their care, including Mark Gustafson.

34.    The Pac-12, as an NCAA member, was required to both protect the health and safety of players and to abide by the NCAA Constitution.

35.    Compared to Mark Gustafson and other UCLA football players, the NCAA was in a uniquely superior position to learn of concussions and TBIs and mitigate the risks and consequences associated with them.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## II.   Scientific Literature and Research Has Long Established the Dangers of Football-Related Concussions

36.    Beginning in the twentieth century, and continuing into the twenty-first century, scientific studies by medical researchers and clinicians have shown that repetitive head impacts can cause concussions, which carry with them a higher risk of suffering long-term brain injury, TBI, memory loss, dementia, CTE, Parkinson's disease, Alzheimer's disease, and other related conditions.

37.    A concussion is a traumatic brain injury that is caused by external trauma to the head, which causes the brain to move rapidly back and forth. The rapid movement inside the skull causes twisting, which can lead to damaged brain tissue and chemical changes inside the brain from these rotational and angular forces.

38.    College athletes who sustain a severe head impact can start exhibiting concussion-related symptoms, including:

- Headache;

- Ringing in the ears;

- Nausea;

- Vomiting;

- Fatigue or drowsiness;

- Blurry vision;

- Confusion or feeling as if on a fog;

- Amnesia surrounding the traumatic event;

- Temporary loss of consciousness (though this does not always occur);

- Slurred speech;

9

- Sleep disturbances;

- Psychological adjustment problems and depression.[6]

39.    A college athlete may not immediately recognize these symptoms, either individually or in some combination, as constituting a concussion. In fact, the symptoms, including confusion and amnesia, might prevent a player from recognizing them or connecting that they result from a concussion. As a result, a player might risk further injury by returning to the game. A brain that has not had sufficient time to heal from concussion is acutely susceptible to further injury.

40.    After sustaining a concussion, doctors prohibit a return-to-play, and thus potential further head impacts, until all the concussion symptoms have subsided. During this timeframe, the brain is particularly susceptible to re-injury (or an aggravation of the existing brain injury).

41.    This convalescence period varies based on the person and concussion symptoms. The concussion symptoms can last for over a week.

42.    When a concussed individual is still exhibiting symptoms after several weeks, a doctor may diagnose the individual with post-concussion syndrome. The constellation of symptoms associated with post-concussion syndrome can last for months or even be permanent.

43.    Scientific research into concussions, which had been conducted over decades, demonstrates that a concussion is not a discrete injury with time-bounded symptoms. Instead, a concussion can have effects that persist and manifest long after the head impact initially triggering the concussion.

---

[6]    Concussion, *Mayo Clinic*, mayoclinic.org/diseases-conditions/concussion/symptoms-causes/syc-20355594 (last visited Aug. 8, 2023).

44.     Numerous medical and scientific journals have been documenting the potential dangers of head trauma and/or their long term effects, including the following:

45.     In 1906, an article by Edward Nichols, M.D., <u>The Physical Aspect of American Football</u>, noted the high frequency of concussions among football players in both practice and games. Dr. Nichols observed that a player that sustained a concussion might run through many additional plays before his teammates noticed him to be mentally irresponsible, that every case involved memory loss, and that the mental state of players following a concussion varied from being excitable, hysterical, confused, or simply unconscious. The article conceded that the real seriousness of the injury was not certain, but Dr. Nichols concluded that constant medical supervision of both teams at football games was necessary. (Boston Medical and Surgical J. 1906; Vol. CLIV, No. 1, pg. 1);

46.     In 1909, Dr. Nichols and Frank Richardson, M.D. wrote a follow-up article, <u>Football Injures of the Harvard Squad for Three Years Under the Revised Rules</u>, which also addressed concussions. Again, the article notes that concussions of the brain have been frequent in football. The article describes a severe case where the football player patient was unconscious for three days and reports that he still complains of difficulty in studying and concentrating his mind and of almost constant headaches. The authors require all concussed players at Harvard to stay in the infirmary overnight in order to avoid the possibility of delayed symptoms, as sometimes occurs, and a student is permitted to return to college if "perfectly clear" the following morning. The article concludes that injuries "are avoided by not playing injured men until they have entirely recovered." (Boston Medical and Surgical J. 1909; Vol. CLX, No. 2, Pg. 33);

47.     In 1928, an article by Harrison Martland, M.D., <u>Punch Drunk</u>, identified a condition commonly present in professional boxers called "Punch

Drunk" which has associated symptoms including unsteady gait, foot dragging, periods of confusion, tremors, vertigo, and sometimes insanity. Dr. Martland opined that a definite brain injury due to "a single or repeated blows on the head or jaw which cause multiple concussion hemorrhages in the deeper portion of the cerebrum" was the condition's cause. Dr. Martland cited past autopsies that demonstrated a cranial injury death, following injuries where the skull is not fractured and there may be no scalp laceration, may occur in which there are no other lesions but multiple punctate hemorrhages in the deeper structures of the brain. Although admitting the limited evidence available, Dr. Martland concluded that "the fact that nearly one half of fighters who have stayed in the game long enough develop [Punch Drunk]," means that the "condition can no longer be ignored by the medical profession or the public." (JAMA 1928; Vol. 91, No. 15, Pg. 1103);

48.    In 1939, an article by Walter Schaller, M.D., <u>After-Effects of Head Injury</u>, concluded "[t]he post-traumatic concussive state produces reversible changes of brain function which, in severe cases, may become irreversible, with demonstrable pathologic change." The article noted that "in severe concussion states, both of the human being and experimental animal, definite pathologic changes have long been recognized and affecting the" brain's myelin, ganglion cells, and the blood vessels. Dr. Shaller explained the residual symptoms of a moderately severe brain concussion (including headache, vertigo, nervousness/irritability, memory loss, poor concentration, and fatigability) will last longer than the immediate symptoms of shock, but rarely last more than three months. (JAMA 1939; Vol. 113, No. 20, Pg. 1779);

49.    In 1942, an article by J.Y. Malone, M.D., <u>Head Injuries – A New Treatment for Postconcussional Headaches and Dizziness: Preliminary Report</u>, recognized that the severity of a head "injury is of no importance in diagnosis [of a concussion], since a very minor blow with no ensuing loss of consciousness may

lead to a particularly vicious type of chronic headache." The article states "[t]he postconcussional syndrome is being recognized more and more frequently as an oft occurring sequela of a concussion of the brain." "It is usually characterized by a triad of symptoms which includes headache, dizziness and emotional disturbances." (JAMA 1942; Vol. 119, No. 11, Page 861); and

50.    In 1952, an article by Augustus Thorndike, M.D., <u>Serious Recurrent Injuries of Athletes – Contraindications to Further Competitive Participation</u>, recommended a three-strike rule for concussions in football *(i.e.,* recommending that players cease to play football after receiving their third concussion).  The article states "[p]atients with cerebral concussion that has recurred more than three times or with more than momentary loss of consciousness at any one time should not be exposed to further body-contact trauma." "The college health authorities are conscious of the pathology of the "punch-drunk" boxer." The article goes on to state that in "all serious cases [of cerebral concussion] one should insist upon complete examination, including . . . consultation with a qualified neurologist or neurosurgeon." (N. Engl. J. Med. 1952; 247:554-556).

51.    The medical and scientific community started conducting additional research that analyzed health consequences of concussion-related injuries in football. One 1967 study, performed by Drs. Hughes and Hendrix, used electroencephalograms ("EEGs") to monitor player brain activity. Shortly thereafter, a potentially fatal condition called "Second Impact Syndrome" was identified, where an injury to an already-concussed brain can trigger a swelling in the brain that the skull cannot handle.

52.    Studies from some of the most reputable peer-reviewed medical journals including the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*, warned of dangers associated

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

with single concussions, multiple concussions, and/or head trauma that results from multiple concussions. These studies established the following:

- Repetitive head trauma, in sports including football, causes potential long-term effects on brain functioning;

- Repeated sub-concussive and concussive blows to the head can cause encephalopathy (previously termed *dementia pugilistica*);

- Rapid acceleration (and deceleration) of the brain from a head impact can tear axons in brain cells;

- Memory issues can occur following concussions;

- Head injury requires sufficient rest and recovery time without exposing an individual to heightened risk of further injury;

- Minor head trauma can lead to neurophysiological and neuropathological changes, which can reduce an individual's information processing ability.

53.    As a result of these studies, medical professionals began to recommend that football change certain rules to mitigate how concussion-related injuries were addressed.

54.    By 1991, Dr. Robert Cantu, the American Academy of Neurology, and Colorado Medical Society had developed return-to-play criteria for football players who are suspected of sustaining head injuries.

55.    The NCAA released a 2003 concussion study that players with previous concussions were more likely to sustain future concussion injuries. Another 2003 study concluded that college football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic,

metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[7]

56.     While the Defendants were aware that the harmful effects of concussions and TBI were jeopardizing the long-term health of the college athletes who made college football possible (and so profitable), they utterly failed to enact meaningful methods to inform college athletes, including college football players, about this medical information. Instead, the Defendants failed to act and were simply content to watch the college athletes grow the game's popularity and revenue.

## III.    Defendants Breached Their Duties to the Student-Athletes By Concealing the Health and Safety Risks of Concussions and Failing to Implement Reasonable Concussion Management Protocols.

57.     For decades, both the NCAA and the Pac-12 Conference were aware that severe head impacts can lead to long-term brain injuries, including memory loss, CTE, dementia, anxiety, depression, and Parkinson's disease.

58.     For decades, based upon information and belief, the Defendants have been advised by physicians, clinicians, and researchers that there are severe risks that come from playing football, including risks associated with concussion and TBI.

59.     Instead of advising college athletes of the risks associated with concussions and TBI-related injuries, or implementing protocols to mitigate these risks, Defendants failed to issue concussion management policies and return-to-play protocols, which had been developed and refined over decades, until 2010.

---

[7]     Michael McCrea, et al., Acute Effects and Recovery Time Following Concussion in College Football Players, The NCAA Concussion Study, *The Journal of the American Medical Association* (November 19, 2003), *available at* http://jama/jamanetwork.com/article/aspx?articleid=197668.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

60.     The Defendants chose instead to completely disregard this vast body of scientific evidence that they had built up, abdicate the authority they possessed overseeing collegiate athletics, and instead did the following:

- Ignored medical risks that Plaintiffs and other UCLA football players faced;

- Increased the medical risks to Plaintiffs and other UCLA football players;

- Failed to educate or otherwise inform Plaintiffs and other UCLA football players of the link between TBIs in football and chronic neurological illnesses and decline;

- Failed to enact any meaningful, enforceable system that could have mitigated, prevented, or addressed TBIs suffered by Plaintiffs and other UCLA football players;

- Failed to implement return-to-play protocols to prevent exacerbating brain injuries.

61.     For the first time in its Sports Medicine Handbook, the NCAA in 1994 finally acknowledged the dangers of concussion by adding "Guideline 2o." But instead of dictating a specific return-to-play protocol, Guideline 2o left concussion treatment to each individual team.

62.     A 1998-99 version of Guideline 2o noted that "[c]oncussion and the resulting potential complications, such as second-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation." Guideline 2o stated that the NCAA "does not endorse any specific concussion grading scale or return-to-play criteria."

63.     Even though the NCAA had actual knowledge of the dangers associated with concussions, knowledge vastly superior to that possessed by individual teams like UCLA, the NCAA refused to endorse a specific concussion grading scale or return-to-play criteria.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

64.    To make matters worse, neither the NCAA nor the Pac-12 enforced—and thus UCLA did not comply with—Guideline 2o's statement that "A student athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred. In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."

65.    Not until April 2010 did the NCAA require that all member institutions implement a Concussion Management Plan ("CMP") for all their sports.

66.    The CMP, which each member institution was required to keep on file, dictated that "a student athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

67.    The policy additionally requires that students diagnosed with a concussion "shall not return to activity for the remainder of the day" and that a team physician must determine medical clearance.

68.    The policy also required that students sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be given educational materials on concussions during the signing of the CMP.

69.    Even this policy suffers from irredeemable faults. Because of the very nature of a concussion, a player who sustains one cannot give informed consent to return-to-play. Given the vulnerable nature of college athletes in this state, it was incumbent on institutions such as the NCAA and the Pac-12 to identify in real time concussions and respond in a medically appropriate manner.

70.    The Defendants' belated concussion policies came way too late for Plaintiffs and the Class, who suffered reasonably foreseeable harm as a result of Defendants' actions.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## FACTS SPECIFIC TO MARK GUSTAFSON

71.    Gustafson played football at UCLA from approximately 1966 to 1968 as a defensive back. Along with four UCLA teammates, Gustafson was named to the All-Pac-8 Conference Team in 1968.

72.    Because UCLA did not enact any concussion management protocols or policies until 2010, Gustafson returned to the field even after sustaining concussive hits. While playing for UCLA, Gustafson sustained at least three concussions.

73.    Gustafson left UCLA in 1968 and was able to work, including from 1988 to 2013 as a sales representative for Sherwin Williams.

74.    As Gustafson started exhibiting obvious mental decline toward the end of his tenure with Sherwin Williams, he was encouraged to retire, which he did in 2013.

75.    That same year, in March 2013, Gustafson was diagnosed with dementia, a diagnosis supported by a range of concerning behaviors Gustafson started exhibiting around this time:

- Thinking other people were trying to steal from him;

- Hiding valuables in strange places and then complaining when he could not find them;

- Asking a question and then repeating the same question several minutes later;

- Struggling to pay bills;

- Losing items excessively;

- Struggling to navigate his way around the airport.

76.    During one medical evaluation, Gustafson returned to topics that had been discussed fifteen minutes prior.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

77. Plaintiff Griggs took care of Gustafson as his cognitive abilities increasingly deteriorated. She noted that by 2018 he had become violent and aggressive, and needed caregivers. Later that year, Gustafson lost his ability to walk, which made caring for him at home difficult.

78. In December 2018, Plaintiff Griggs helped Gustafson get admitted into a memory care facility. Due to Gustafson's violent behavior while at the facility, he was asked to leave. Gustafson was moved into another facility in Salem, Oregon in 2019.

79. On August 27, 2021, Gustafson died in Oregon.

80. A neuropathology report performed after Gustafson's death included the following diagnoses:

a. CTE Stage IV;

b. Alzheimer's (Braak Stage IV);

c. Age-related degenerative disease – Tau astroliopathy, TDP-43 Stage 3

d. Cerebrovascular disease.

## CLASS ACTION ALLEGATIONS

81. **Class Definition**: Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of Gustafson and a class defined as follows:

All individuals who participated in UCLA's varsity football program between 1966 and 2010 (the "Class").

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute

and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

82. **Numerosity**: The exact number of the members of the Class is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, hundreds of UCLA football players fall into the definition of the Class. Members of the Class can be identified through the Defendants' records.

83. **Commonality**: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to the following:

(a) Whether Defendants had a duty to adequately warn and educate players of the risks associated with repeated head impacts and concussions;

(b) Whether Defendants had an obligation to enact rules to protect players from sustaining concussions;

(c) Whether Defendants' conduct as alleged herein constitutes a breach of duty;

(d) Whether Defendants' conduct constitutes negligence;

(e) Whether Defendants' conduct constitutes breach of contract;

(f) Whether Defendants' conduct constitutes fraudulent concealment;

(g) Whether Defendants were unjustly enriched at the expense of Plaintiffs, on behalf of Mark Gustafson and the Class; and

(h) Whether Plaintiffs, on behalf of Mark Gustafson, and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

84. **Typicality**: Plaintiffs' claims, asserted on behalf of Mark Gustafson, are typical of the claims of other members of the Class, as Plaintiffs and other members of the Class sustained damages arising out of the wrongful conduct of Defendants based upon the same negligent conduct.

85. **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

86. **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Class are relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for the members of the Class to obtain effective relief from Defendants' misconduct on an individual basis. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

# FIRST CAUSE OF ACTION
## NEGLIGENCE
### (Individually and on Behalf of the Class as Against All Defendants)

87.    Plaintiffs incorporate by reference all of the preceding allegations except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Court or elsewhere.

88.    At all relevant times, the NCAA owed a duty Plaintiffs, Gustafson, and the Class to supervise, regulate, monitor, and provide reasonable and appropriate rules to minimize the risk of injury associated with repetitive head trauma, concussions, and TBIs.

89.    Plaintiffs, Gustafson, and the Class reasonably and justifiably relied on the NCAA and the Pac-12 to protect their health and safety while playing college football.

90.    The Defendants acted carelessly and negligently in their positions as regulatory bodies for collegiate football teams and their student athletes, including to Plaintiffs, Gustafson, and the Class. The Defendants knew or should have known that their actions (or inactions), in light of the increasing rate and extent of reported concussions, would cause Plaintiffs, Gustafson, and the Class harm in both the short and long term.

91.    Defendants were careless and negligent by breaching the duty of care they owed Plaintiffs, Gustafson, and the Class, both generally and in the following respects:

a. Failing to educate Gustafson and the Class concerning symptoms that may indicate a concussion has occurred;

b. Failing to warn Gustafson and the Class of the risk of unreasonable harm resulting from repeated concussions;

c. Failing to disclose to Gustafson and the Class the special risks of long-term complications from repeated concussions and return to play;

d. Failing to disclose to Gustafson and the Class the role of repeated concussions in causing the chronic life-long neurological conditions;

e. Failing to promulgate rules and regulations to adequately address the dangers to Gustafson and the Class of repeated concussions and failing to implement a return-to-play policy to minimize long-term chronic cognitive and neurological problems for which they were at an increased risk;

f. Misrepresenting pertinent facts that Gustafson and the Class needed to be aware of to make decisions on the safety of their return to play;

g. Concealing pertinent facts necessary for Gustafson and the Class to make an informed decision about participating in football;

92. Such actions and inactions led to Gustafson's death via CTE and both short-term and long-term negative health consequences to Gustafson.

93. Defendants breached the duties they owed the Plaintiffs, Gustafson, and the Class by failing to disclose, failing to recognize, or being willfully blind to (a) material information regarding the short-term and long-term health consequences to Plaintiffs, Gustafson, and the Class from repetitive head impacts, concussions, and TBIs; and (b) proper ways to evaluate, treat, and avoid sub-concussive hits and concussive trauma to college athletes, including to the Gustafson and the Class.

94. Plaintiffs, Gustafson, and the Class relied upon the guidance of the Defendants, who were at all relevant times in a superior position to understand the risks associated with sub-concussive hits, concussions, and TBIs. Because this information was not available to Plaintiffs, Gustafson, or the Class, Defendants should have known that they would act on the guidance offered by the Defendants on this crucial medical issue, both while at UCLA and thereafter.

95.    Repetitive TBIs during practices and games have a pathological and latent effect on the brain. The repetitive head impacts expose a player's brain to twisting and stretching of neuronal cells such that chemical damage inside the brain can occur, the same pathology of "punch drunk syndrome" studied by Dr. Martland back in 1928.

96.    Gustafson and the Class experienced these sub-concussive and concussive impacts while playing at UCLA, which significantly increased their risk for neurodegenerative conditions and diseases, including CTE, Alzheimer's disease, and other cognitive impairments.

97.    The rapid accelerations and hits to which Gustafson and the Class were exposed presented heightened risks of latent and long-term debilitating illnesses. But for Defendants' negligence, the risk of harm to Gustafson and the Class would be substantially lower, and Gustafson and the Class would not have suffered the brain damage that they suffered and that Gustafson died from.

98.    The repetitive head impacts, which caused TBIs, led to long-term neurocognitive and neurobehavioral changes in Gustafson and the Class, which required medical care and led to Gustafson's death.

99.    As a direct and proximate result of the Defendants' negligence, Plaintiffs have sustained the following damage:

  a.  The amount of reasonable medical expenses, necessarily incurred in the treatment of Gustafson and the Class;

  b.  Mental anguish suffered, past and future;

  c.  Loss of earnings, past and future;

  d.  Physical impairment and disfigurement;

  e.  Loss of consortium with family and/or spouse;

  f.  Funeral expenses.

100.   As a result of their misconduct, Defendants are liable for the full amount of damages under applicable law. Plaintiffs, individually and on behalf of the Class, seek actual damages for Defendants' negligence, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## SECOND CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
## (Individually and on Behalf of the Class Against All Defendants)

101.   Plaintiffs incorporate by reference all of the preceding allegations except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Court or elsewhere.

102.   Defendants had knowledge that the college athletes who competed in football games were being exposed to repetitive head impacts and full-contact practices, which created a risk of harm similar or identical to that faced by boxers, as documented by studies dating back to the 1920s.

103.   Defendants were aware of this literature on boxers, as well as the wealth of published medical literature described above in this Complaint, which detailed the serious risk of short-term and long-term brain injury that is associated with repetitive traumatic impacts to the head to which UCLA football players were exposed both during games and at practices.

104.   By concealing health and safety facts related to concussions and TBIs, the Defendants created an erroneous belief in the Gustafson and the Class that continued football play, even in the immediate aftermath of a concussion, would not have long-lasting consequences.

105.   Defendants knew and/or could have reasonably been expected to learn the truth about risks associated with sub-concussive and/or concussive injuries. Gustafson and the Class were under the care and guidance of Defendants, and justifiably relied on their silence as representing facts (namely, the lack of

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

devastating future consequences to their brain that could have life-long impacts) that did not exist.

106. Because of the Defendants' unique vantage overseeing collegiate athletics, Gustafson and the Class reasonably looked to Defendants for guidance on head injuries, concussions, and TBIs, including how these would manifest in the future.

107. The nature of the concealed information was such that, had it been revealed to Gustafson and the Class, they would have (a) not continued to play after sustaining a head injury; (b) taken additional time to allow concussion symptoms to subside before resuming play; (c) have taken additional precautions while playing football; and/or (d) not continued to play college football at all. Despite Defendants' knowledge, they did not take reasonable measures to mitigate the risks by refusing to issue any appropriate concussion guidelines or return to play criteria. The Defendants' inaction and concealment of relevant health and safety facts related to concussion injuries increased the risk of serious long-term harm to college athletes, including those like Gustafson and the Class, who played football at UCLA.

108. As a direct and proximate result of this concealment, Plaintiffs and Gustafson have suffered and Class members continue to suffer from their substantial injuries, emotional distress, pain and suffering, and non-economic damages, damages that are ongoing and continuing in nature.

109. As a result of the Defendants' negligence, Defendants are liable to Plaintiffs for the full amount of damages allowed under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for Defendants' fraudulent concealment, as well as interest, reasonable attorneys' fees, expenses, and costs to the maximum extent allowable by law.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS CONTRACT
### (Individually and on Behalf of the Class as Against Defendant NCAA)

110.   Plaintiff incorporates by reference all of the preceding allegations except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Court or elsewhere.

111.   While competing as a football player for UCLA, Gustafson entered into a contract with the NCAA in order to play. The contract required that Gustafson and fill out a form affirming that he had read the NCAA regulations and applicable NCAA Division manual, which expressly includes the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and also an agreement to abide by NCAA Division bylaws.

112.   The NCAA, as the other party to this contract, promised to perform certain duties and functions, among other things:

    a.   Conduct intercollegiate athletics in a manner that promotes the physical and educational well-being of college athletes; and

    b.   Require that its member institutions protect the health of, and provide a safe environment for, each of their college athletes;

113.   By signing and agreeing to abide by the NCAA's regulations, and then participating as UCLA football players in accordance with such regulations, Gustafson and the Class fulfilled their contractual obligations to the NCAA.

114.   But, as described in the preceding paragraphs, the NCAA breached their agreement to college athletes like Gustafson and the Class by concealing and/or failing to warn players about the risks associated with head trauma, concussions, and TBIs, as well as the long-term risks associated with head trauma, concussions, and TBIs, that may manifest several years after Gustafson and the Class finish playing football.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

115.   Gustafson and the Class entered into written agreements with the NCAA in which they committed to play football at UCLA, attend UCLA as student-athletes, and comply with all regulations and obligations imposed by the NCAA as both players and students.

116.   The NCAA's contractual breaches led Gustafson and the Class to suffer physical injury, medical expenses, and other items of damages laid out above including pain and suffering, which occurred in the past and are ongoing.

117.   As a result of its negligence, Defendant NCAA is liable to Plaintiffs for the full amount of damages allowed under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for the NCAA's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the maximum extent allowable by law.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
## (Individually and on Behalf of the Class as Against All Defendants)

118.   Plaintiffs incorporate by reference all of the preceding allegations except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Court or elsewhere.

119.   Even if there is no established written contract between Plaintiffs, Gustafson, the Class, and the Defendants, the facts, as set out above, support the finding of an implied contract.

120.   Under this implied contract, college athletes, including Gustafson, and the Class, agreed to be bound by Pac-12 and NCAA rules and regulations in exchange for their participation in NCAA and Pac-12 run athletics programs, including the UCLA football program. As a condition of this implied contract, the NCAA and the Pac-12 agreed to abide by and enforce the promises set out in the NCAA's Constitution and Bylaws.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

121.   Gustafson and the Class indicated that they accepted the terms of this implied contract, and fully performed under the contract, by participating in the UCLA football program in accordance with NCAA and Pac-12 rules and regulations.

122.   Defendants breached contractual duties they had implicitly assumed by failing to ensure that college athletes were provided a safe environment to practice and play football. Defendants further breached their contractual duties by concealing and/or negligently failing to inform players about the symptoms and the long-term risks from head trauma, concussions, and TBIs.

123.   Defendants' breaches caused Plaintiff, Gustafson, and the Class to suffer (and continue to suffer) physical injury and damages in the form of past and future medical expenses, pain and suffering, other out of pocket expenses, lost past earnings, lost future earning capacity.

124.   As a result of their misconduct, Defendants are liable to Plaintiffs for the full amount of damages allowed under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the maximum extent allowable by law.

**FIFTH CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
**(Individually and on Behalf of the Class as Third-Party**
**Beneficiaries as Against Defendant NCAA)**

125.   Plaintiffs incorporate by reference all of the preceding allegations except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Court or elsewhere.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

126.   To the extent there is no established express or implied contract between Plaintiffs, Gustafson, and Defendants, an express contract did exist between the NCAA and UCLA.

127.   Under the terms of this contract, UCLA agreed to follow applicable NCAA rules and regulations, including those that were set out in the NCAA's Division Manuals, Constitution, and Bylaws.

128.   Under the terms of this contract, UCLA and the NCAA agreed to, among other things (1) conduct intercollegiate athletic programs in a way that would protect the health, and the physical and educational well-being of college athletes; (2) provide a safe environment for each of the college athletes participating.

129.   Plaintiffs, Gustafson, and the Class are the intended third-party beneficiaries of the contract between the NCAA and UCLA. This intention can be seen in the express language of the NCAA's rules and regulations, as well as the stated principles of the NCAA organization.

130.   NCAA breached the contractual duties owed Gustafson and the Class under that contract by (1) failing to institute any concussion guidelines and return to play criteria to minimize or prevent the risk of head trauma, concussions and TBIs; and (2) failing to adequately inform, advise, and educate UCLA football players on the symptoms and long-term dangers that come from head trauma, concussions, and TBIs.

131.   Due to the NCAA's negligence, Plaintiffs, Gustafson, and the Class suffered physical injury and damages, including past and future medical expenses, other out of pocket expenses, pain and suffering, lost past earnings, lost future earning capacity, and other damages. Additionally, Plaintiffs, Gustafson, and the Class are likely to experience future damages caused by the Defendants' conduct.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

132.   As a result of the Defendant NCAA's misconduct, Defendant NCAA is liable to Plaintiffs for the full amount of damages under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for the NCAA's contractual breaches, as well as interest, reasonable attorneys' fees, and costs to the maximum extent allowable by law.

**SIXTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
***(In the Alternative to Breach of Contract)***
**<u>(Individually and on Behalf of the Class as Against All Defendants)</u>**

133.   Plaintiff incorporates by reference all of the preceding allegations, excluding paragraphs 110-132, except to the extent any averments may be inconsistent with any alternative liability claims or relief sought in this Court or elsewhere.

134.   Defendants receive significant revenues from the work of college football players like Gustafson and the Class members. These revenues include, but are not limited, money from stadium gate receipts, merchandising agreements, and broadcasting/TV deals.

135.   Defendants have knowledge of, and derive value from, these benefits.

136.   In equity and fairness, Defendants cannot be permitted to retain profits at the expense of Plaintiffs, Gustafson, and the Class while declining to pay for the medical expenses incurred as a result of their inactions in the face of ample medical and scientific knowledge regarding head trauma, concussions, and TBIs.

137.   Plaintiffs, individually and on behalf of the Class, seek restitution and/or disgorgement of all money Defendants have received unjustly as a result of the conduct alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jeannie Griggs and Jasmine Patterson, on behalf of Mark Gustafson, and on behalf of the Class defined above, requests that the Court enter an Order providing the following:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiffs, on behalf of Mark Gustafson, as the as Class Representatives, and appoint their counsel as Class Counsel;

B.    Determine and declare that Defendants' actions, as described above, constitute negligence, fraudulent concealment, breach of contract, or, in the alternative to breach of contract, unjust enrichment;

C.    Award all actual, compensatory, monetary, and punitive damages caused by Defendants' conduct, including damages for past, present, and future medical expenses, lost past earnings, lost future earning capacity, and any other damages allowed by law;

D.    Award Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

E.    Award Plaintiffs and the Class pre- and post-judgment interest, to the maximum extent allowable;

F.    Enter injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class;

G.    Award such other and further relief as justice, equity, and fairness may require.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues that are triable.

Respectfully submitted,

Dated: August 22, 2023        By: */s/* Todd Logan

Todd Logan – SBN 305912

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

tlogan@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Patrick DeBlase – SBN 167138
deblase@dbelegal.com
DeBlase Brown Eyerly LLP
Los Angeles, California 90021
Tel: 310.575.9955
Fax: 310.575.9919

Justin Shrader*
justin@shraderlaw.com
D'Arcy L.R. Rapp*
darcy@shraderlaw.com
Jim Hartle*
jim@shraderlaw.com
Nick Fernelius*
Nick@shraderlaw.com
SHRADER & ASSOCIATES
9 Greenway Plaza, Suite 2300
Houston, Texas 77046
Tel: 713-782.0000
Fax: 713.571.9605

*Attorneys for Plaintiffs*

*To seek admission *pro hac vice*, through
designated local counsel Patrick DeBlase

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL